UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Robert Breeze,

             Plaintiff,

   vs.                         REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of Social
Security,

            Defendant.        Civ. No. 07-2283 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, <u>Title 42 U.S.C. §405(g)</u>, seeking a judicial review of the Commissioner's final decision which denied his application for Disability Insurance Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions for Summary Judgment. The Plaintiff has appeared by Paul Mundt, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For reasons which follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

II. <u>Procedural History</u>

The Plaintiff first applied for DIB on November 10, 2003, at which time, he alleged that he had been disabled since October 1, 2000. [T. 60-63; 99]. The Plaintiff later amended his onset date to June 3, 2004. [T. 157]. The Plaintiff met the insured status requirement at the amended onset date of disability, and remained insured for DIB through March 31, 2007. [T. 99].

The State Agency denied the claim upon initial review, and upon reconsideration. [T. 29-32]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on February 23, 2006, a Hearing was conducted, at which time, the Plaintiff appeared, and was accompanied by a non-attorney representative. [T. 409-33]. Thereafter, on July 14, 2006, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 12-26]. The Plaintiff requested an extension of time for an Administrative Review before the Appeals Council, which was granted by letter dated October 3, 2006. [T. 10-11]. On March 24, 2007, the Appeals Council denied the Plaintiff's claim for review. [T. 6-8]. Thus, the ALJ's determination became the final decision of the Commissioner. See, <u>Casey v. Astrue</u>, 503 F.3d 687, 690 (8th Cir. 2007); <u>Grissom v. Barnhart</u>, 416 F.3d 834, 836

(8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v.

Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

### III.  Administrative Record

A.  Factual Background.  The Plaintiff was fifty-two (52) years old on the

date of the Hearing.  [T. 61].  He is left-handed, completed the tenth grade, and has

past relevant work experience as a pawn shop manager, a welder, and a musician.  [T.

76; 81; 84-5; 112].  The Plaintiff last worked in December of 2003.  [T. 64; 75; 85;

108].  The Plaintiff alleges that he cannot work due to a seizure disorder, coronary

artery disease, depression, headaches, and a back impairment.  [T. 75].

1.  Medical Records.  In February of 2000, the Plaintiff was seen by

Dr. Timothy Rietz for a history of seizures that dated back approximately four (4)

years.  [T. 244].  Dr. Rietz noted that the Plaintiff had not experienced a seizure in the

past year, and did not complain of any side-effects from his seizure medication,

Dilantin.[1]  Id.

---

[1]Dilantin is a trademark for preparations of phenytoin, which is "an anticonvulsant and cardiac depressant used in the treatment of all forms of epilepsy except petit mal and as an antiarrhythmic."  Dorland's Illustrated Medical Dictionary, at pp. 502, 1374 (29th Ed. 2000).

The Plaintiff was seen in March of 2000 by Dr. Cory Boyce for complaints relating to his seizure disorder, and Dr. Boyce noted that the Plaintiff had not experienced a seizure for the past two (2) years, and also that he was not able to tell if the Plaintiff suffered from a true seizure disorder, or if his prior seizures had been caused by alcohol withdrawal.  [T. 242-43].

The Plaintiff saw Dr. Boyce again, in September of 2000, and reported that he had experienced a seizure in July of 2000.  [T. 239].  Dr. Boyce noted that the Plaintiff had a long history of non-compliance with Dilantin, and that the Plaintiff acknowledged that most of his seizures had been related to his failure to comply with prescribed treatment.  Id.  Dr. Boyce found the Plaintiff's report of a seizure in July of 2000 to be credible, and noted that his continued abuse of alcohol could cause complications and interfere with his prescribed medication.  [T. 240].

In October of 2000, the Plaintiff was admitted to the Austin Medical Center with chest pain that was diagnosed as unstable angina and dyslipidemia, and was treated with nitrogylcerin.[2]  [T. 159].  The medical records note that the Plaintiff was a long-standing smoker, who had smoked one (1) pack of cigarettes per day for the

---

[2]Nitroglycerin is "used in medicine chiefly in the prophylaxis and treatment of angina pectoris."  Dorland's Illustrated Medical Dictionary, at p. 1221 (29th Ed. 2000).

past twenty-five (25) years, and drank approximately six (6) beers per week.  Id. After an angiogram revealed significant coronary artery disease, the Plaintiff underwent successful angioplasty, and stent placement.  [T. 161; 173; 176; 182]. Later that month, the Plaintiff again complained of chest pain. [T. 183].  A stress test showed mild inferior and lateral ischemia, but good work load, and the Plaintiff's physicians recommended treatment with medications, including Zocor, ASA, metoprolol, and Dilantin.[3]  [T. 184; 186; 232; 235].

The Plaintiff next complained of chest pain that did not respond to nitroglycerin in November of 2000, when he presented at the emergency room.  [T. 232].  The medical records disclose that the Plaintiff had a history of non-compliance, and that he had stopped taking all of his medications except Dilantin, failed to show up for a previously scheduled coronary angiogram, and continued to drink two (2) to three (3) alcoholic beverages per night on the weekend.  [T. 232-33].  Later that month, the Plaintiff again complained of chest discomfort while walking on a treadmill in cardiac rehabilitation, and Dr. Boyce noted that the Plaintiff did not use nitroglycerin reliably.

---

[3]Zocor is "a lipid-lowering agent" that is used to reduce levels of cholesterol. Physician's Desk Reference, pp. 2115-18 (62nd ed. 2008).  ASA is an abbreviation for acetylsalicylic acid, which is the chemical name for aspirin.  See, Dorland's Illustrated Medical Dictionary, at pp. 14, 156 (29th Ed. 2000).  Metoprolol is "used in the treatment of angina pectoris and hypertension."  Id. at p. 1106.

[T. 235].  Dr. Boyce subsequently referred the Plaintiff to Dr. Farouk Mookadam, who ordered a coronary angiogram.  [T. 237-38].

In January of 2003, the Plaintiff reported chest pain occurring approximately once a week, which he relieved by taking nitroglycerin.  [T. 228].  By March of 2003, the Plaintiff reported that he was doing "fairly good," denied having to use nitroglycerin, and complained of only occasional chest pain that lasted a few seconds. [T. 226].  In an examination on September of 2003, the Plaintiff admitted that he had not been taking his medications, was not exercising or following a healthy diet, and continued to smoke half a pack of cigarettes per day.  [T. 224].  At that time, the Plaintiff complained of depression, and a nurse practitioner prescribed Celexa[4] and noted that the Plaintiff was not interested in finding a primary care physician.  [T. 225].

About six (6) months later, in March of 2004, the Plaintiff had an initial appointment with Dr. Vijay Krishramoorthy in order to establish a primary care physician.  [T. 221].  At that time, the Plaintiff complained of numerous problems, including a seizure disorder, dyslipidemia, hypertension, obesity, depression,

---

[4]Celexa is "indicated for the treatment of depression."  Physician's Desk Reference, p. 1162 (62nd ed. 2008)

gastroesophageal reflux disease, low back ache, and coronary artery disease. Id. The Plaintiff further stated that he experienced one (1) grand mal seizure every month, and smaller seizures, that lasted for a few seconds to a few minutes, about twice a week. Id. Dr. Krishramoorthy commented that the Plaintiff had symptoms of sleep apnea, although the Plaintiff admitted that he had very poor sleep hygiene. [T. 222]. The Plaintiff returned later in March of 2004 and reported that he had stopped drinking forty-five (45) days prior to his visit, and Dr. Krishramoorthy opined that giving up alcohol would help the Plaintiff manage his seizures. [T. 219-20]. The Plaintiff also complained of depression and anxiety, and Dr. Krishramoorthy advised the Plaintiff to continue to take Celexa, and referred him to counseling. [T. 220].

In April of 2004, the Plaintiff saw a nurse practitioner complaining of chest pain, and stated that he did not want to return to Dr. Krishramoorthy because he felt that the physician had not addressed the Plaintiff's mental health problems. [T. 215]. The nurse practitioner noted that the Plaintiff had not followed through with a laboratory work-up, or mental health counseling, and encouraged the Plaintiff to make additional appointments. [T. 216]. Later in April of 2004, Dr. Dahlia Saad performed a psychiatric evaluation of the Plaintiff. [T. 211-14]. The Plaintiff reported a lifelong history of mild depressive symptoms and poor motivation, and stated that his

symptoms had escalated recently, and included sadness, poor energy, poor sleep, and daily crying spells.  [T. 211].  Dr. Saad expressed concern about the possibility that the Plaintiff continued to abuse alcohol, as he initially stated that he no longer drank, and later added that he "just [did not] drink much." [T. 211, 214].  Dr. Saad diagnosed depression, and assigned the Plaintiff a GAF score of 50, increased the Plaintiff's dose of Celexa, and recommended therapy.[5]  [T. 214].

In June of 2004, the Plaintiff saw a nurse practitioner for a follow up of his coronary artery disease.  [T. 208].  Although the Plaintiff initially stated that he was compliant with his medications, he later admitted that he did not take his medications regularly and, on examination, his Dilantin levels were found to be sub-therapeutic. [T. 208-09].  The nurse practitioner noted that, although the Plaintiff denied alcohol use, she had personally observed him drinking.  [T. 208].  Two (2) days later, the Plaintiff saw Dr. Saad for a follow-up examination, and stated that his depressive

_____

[5]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships.  Id.

symptoms had been resolved, although he complained of affective blunting as a side effect of his anti-depressant medication.  [T. 206].  Dr. Saad decreased the Plaintiff's dose of Celexa.  Id.

The Plaintiff saw Dr. Saleh Alrajhi in August of 2004, due to complaints of a ten (10) to twelve (12) year history of low back pain.  [T. 202].  At the time of the examination, the Plaintiff rated his pain as 3/10 and, on examination, the Plaintiff was found to have a negative straight leg raise test, normal muscle strength, intact sensory functioning, and symmetrical reflexes.  [T. 203].  The Plaintiff was referred to physical therapy, and told to take over-the-counter medications for his back pain, and he was also referred to a sleep clinic.  Id.

In October of 2004, the Plaintiff presented for a follow-up regarding his hyperlipidemia and coronary artery disease, and the medical records, from that visit, disclose that the Plaintiff was non-compliant with medical advice, as he continued to smoke and drink heavily, and he did not follow his diet or medication regimen.  [T. 356].  A variety of lab studies were ordered, and the Plaintiff was advised to follow-up with a primary care physician.  [T. 357].  In November of 2004, the Plaintiff saw Dr. Kirk Mueller for an individual therapy session, in which he complained of dysphoria and social isolation, although the Plaintiff acknowledged that he played in a band, and

had recent engagements at a bar, and at a resort. [T. 352]. Dr. Mueller recommended group therapy. Id.

Also in November of 2004, the Plaintiff saw Colleen Byrnes, who is a Nurse Practitioner, and Dr. Boyce, in an effort to obtain a primary care provider. [T. 341]. The Plaintiff admitted that he did not take his medications regularly, and the health care providers noted that the Plaintiff's last Dilantin level was sub-therapeutic. Id. The Plaintiff admitted that he continued to drive an automobile, although he claimed that he limited himself to short distances, and also stated that he drank about four (4) to five (5) beers per week. Id. Dr. Boyce renewed the Plaintiff's prescription for Dilantin, and ordered him not to drive a car under any circumstances. [T. 342]. A sleep study, in December of 2004, revealed findings consistent with obstructive sleep apnea, and the Plaintiff was prescribed a CPAP nasal mask, which proved beneficial. [T. 330; 339-40].

At a follow-up therapy session with Dr. Mueller, in May of 2005, the Plaintiff stated that, in the past, he had tried to stay active by walking and bicycling, but had stopped engaging in those activities. [T. 325]. In a visit with Dr. Mueller two (2) weeks later, the Plaintiff reported that he was playing music at a bar, and acknowledged that his prior referral for psychiatric services with Dr. Saad had not

been successful, as he had failed to appear for three (3) of his appointments.  [T. 321].

In July of 2005, the Plaintiff sought treatment for headaches, and was prescribed Relafen.[6]  [T. 313-20].  Later in July of 2005, the Plaintiff saw Dr. Saad after an absence of approximately one (1) year.  [T. 311].  The Plaintiff complained of severe symptoms of depression, as well as a recurrence of seizures, headaches, crying spells, and poor energy.  Id.  Dr. Saad prescribed Zoloft.[7]  [T. 312].

Dr. Daniel Lachance saw the Plaintiff in August of 2005, for a neurological examination, primarily due to the Plaintiff's complaints of headaches.  [T. 305-06].  The Plaintiff also complained of grand mal seizures that occurred several times a year, as well as partial seizures that occurred more frequently.  [T. 305].  Dr. Lachance reported normal neurological examination findings, prescribed Topamax, and ordered an MRI of the Plaintiff's brain.[8]  [T. 306].  Also in August of 2005, the Plaintiff saw

---

[6]Relafin is a trademark for a preparation of nabumetone, which is "used in the treatment of osteoarthritis and rheumatoid arthritis."   Dorland's Illustrated Medical Dictionary, at pp. 1175, 1555 (29th Ed. 2000).

[7]Zoloft is a trademark for a preparation of sertraline hydrochloride, which is "used as an antidepressant."   Dorland's Illustrated Medical Dictionary, at pp. 1629, 1997 (29th Ed. 2000).

[8]Topomax is "indicated as initial monotherapy in patients 10 years of age and older with partial onset or primary generalized tonic-clonic seizures."  Physician's Desk Reference, p. 2380 (62nd ed. 2008).

Dr. Mueller for a therapy session, in which he acknowledged that he had missed another appointment with Dr. Saad. [T. 303]. The Plaintiff saw Dr. Saad about ten (10) days later, and stated that he had experienced some benefit from Zoloft, but had stopped taking it because of the cost, and because he "became somewhat impatient." [T. 301]. Dr. Saad restarted the Plaintiff's prescription for Zoloft, and stressed the importance of persisting with medical care. [T. 301-02]. In September of 2005, the Plaintiff advised Dr. Mueller that he experienced improved energy once he started taking Zoloft again. [T. 299].

In September of 2005, the Plaintiff complained of angina during an examination with Dr. Andrew Moore, who noted that the Plaintiff was not a good historian, and was extremely vague about his symptoms. [T. 294]. Dr. Moore was unable to determine whether the Plaintiff was experiencing angina, and ordered an exercise test without making any changes to the Plaintiff's medical regimen. [T. 297]. An exercise stress test was negative, and the Plaintiff was instructed to start a regular exercise program. [T. 282-83; 287].

The Plaintiff had several therapy sessions with Dr. Mueller, in October of 2005, and Dr. Mueller noted that the Plaintiff's insight and judgment appeared to be intact, although he demonstrated mild anxiety apparent on examination. [T. 277-30]. Dr.

- 12 -

Mueller recommended continued therapy, and provided encouragement to the Plaintiff to continue being active socially by joining support networks.  [T. 278; 383-86].

In November of 2005, the Plaintiff reported that he had a grand mal seizure and fell, injuring his neck, low back, and right shoulder.  [T. 378].  X-rays of the Plaintiff's cervical spine, lumbar spine, and right shoulder, revealed no acute fractures or dislocations, and the Plaintiff was diagnosed with a strain.  [T. 379-82].

2.   Evaluations.   In June of 2004, Dr. Mueller completed a medical opinion form, in which he stated that the Plaintiff would not be able to perform any employment for the foreseeable future.  [T. 189].  When asked to list any permanent physical or mental limitations, Dr. Mueller wrote "history of epilepsy and degenerative disc in lower back by report."  Id.

Two State Agency physicians reviewed the Record in June of 2004, and October of 2004, respectively, and concluded that the Plaintiff could perform medium work involving no climbing ladders, ropes, or scaffolds, occasional stooping, crouching, and climbing ramps and stairs, and no exposure to hazards.  [T. 190-98].

In February of 2006, Dr. Mueller completed forms summarizing the Plaintiff's mental impairments.  [T. 387-98].  Dr. Mueller listed the Plaintiff's diagnoses as an adjustment disorder/depression, and a depressive order not otherwise specified and,

- 13 -

as clinical findings, Dr. Mueller noted that the Plaintiff experienced significant dysphoria, low energy level, poor sleep, lack of concentration, and isolation. [T. 387]. Dr. Mueller rated the Plaintiff's GAF score as 55, and found that his highest GAF score in the past year was 60, which is consistent with moderate symptoms. Id. Dr. Mueller also rated numerous work-related areas, and concluded that the Plaintiff had no useful ability to function in the areas of dealing with normal work stress, or to deal with the stress of semi-skilled and skilled work. [T. 389].

Dr. Mueller further found that the Plaintiff was "unable to meet competitive standards" in the areas of maintaining attention for two (2) hour segments, completing a normal workday, performing at a consistent pace, understanding, remembering, and carrying out, detailed instructions, adhering to basic standards of neatness and cleanliness, and traveling in unfamiliar places. [T. 389-90]. Dr. Mueller also stated that the Plaintiff would miss more than four (4) days per month due to his impairments and treatment. [T. 392].

B.    Hearing Testimony. The Hearing on February 23, 2006, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record. [T. 441]. The ALJ noted that the Plaintiff was accompanied by a representative, who was not an attorney, and ascertained that the Plaintiff's

- 14 -

representative had discussed the issues with the Plaintiff, and was satisfied that the Plaintiff understood the issues.  Id.  The ALJ asked the Plaintiff's representative if he had any objection to any of the exhibits, and he stated that he did not, but asked the ALJ to keep the Record open so that he could submit medical records from an appointment with Dr. Lachance, which was scheduled for March 14, 2006.  [T. 411-12].  The ALJ agreed to keep the Record open, and then asked the Plaintiff's representative if he had any opening remarks.  [T. 412].

The Plaintiff's representative stated that the Plaintiff's treating psychologist had completed an RFC questionnaire, and that, according to the responses on that questionnaire, the Plaintiff was precluded from all work due to major depression.  Id. In addition, the Plaintiff's representative argued that the Plaintiff had been diagnosed with severe coronary artery disease, severe sleep apnea, medically complex obesity, and had been assigned a GAF of 50.  Id.

The ALJ then swore the Plaintiff to testify, and asked the Plaintiff how often he experienced seizures.  Id.  The Plaintiff replied that, on average, he had petit mal seizures daily, and suffered two (2) or three (3) grand mal seizures per month. [T. 412-13].  In response to the ALJ's question regarding his medications, the Plaintiff explained that he took Dilantin, and Topamax, to control his seizures.  [T. 413].

Next, the ALJ asked the Plaintiff about his current work, and the Plaintiff stated that he played in a band and tended bar on Thursday, Friday, and Saturday nights, and earned approximately $600.00 per month. Id. The ALJ asked the Plaintiff why he felt that he could not work, and the Plaintiff replied that he was unable to get out of bed on some days, and he added that, for twenty-four (24) hours following a seizure, his depression was incapacitating. Id.

The ALJ asked the Plaintiff how much alcohol he drank, and the Plaintiff testified that he drank one (1), or two (2) beers, on Friday or Saturday night, and added that he smoked half a pack of cigarettes per day. Id. The Plaintiff added that he was compliant with his seizure medications, and that he did not use any other drugs, except his prescription medications, which included Topral for blood pressure, Protonix for acid reflux, Isosorbide for his heart, Zertia and Zocor for his cholesterol, and also a medication for migraine headaches.[9] Id. The ALJ asked about the

---

[9]Topral is "indicated for the treatment of hypertension." Physician's Desk Reference, p. 650 (62nd ed. 2008). Protonix is "indicated for maintenance of healing of erosive esophagitis and reduction in relapse rates of daytime and nighttime heartburn symptoms in patients with gastroesophageal reflux disease. Id. at p. 3412. Isosorbide is "used in the treatment of coronary insufficiency and angina pectoris." Dorland's Illustrated Medical Dictionary, at p. 924 (29th Ed. 2000). Zertia is "indicated as adjunctive therapy to diet" for the reduction of cholesterol in patients with hypercholersterolemia. Physician's Desk Reference, supra at p. 3034. Zocor is a trademark for a preparation of simvastatin, which is "used to lower blood lipid levels

Plaintiff's migraines, and the Plaintiff explained that he first started getting headaches in August of 2005, when he had severe headaches for approximately three (3) months, and that he still experienced severe headaches a couple of times a week, which lasted for hours without medication, but were controlled by his medication. [T. 415]. In addition, the Plaintiff reported that, on one (1) occasion in August of 2005, prior to receiving his present prescription for migraine medication, he had gone to the emergency room, and received a shot of a painkiller to treat a severe headache. Id.

The ALJ turned to the Plaintiff's previous work history, and the Plaintiff stated that he had previously worked at a pawn shop, for approximately one (1) year, earning $5.00 an hour, and had only worked twenty-five (25) or thirty (30) hours a week, because his manager had observed him have seizures while he was a patron in a bar, and was concerned that, if he worked too much, he could have a seizure while he was on the job. [T. 415-16]. The ALJ asked the Plaintiff to describe his responsibilities at the pawn shop, and the Plaintiff stated that he would take items in on pawn, and then place them in the store if the owner failed to redeem the item. Id. The Plaintiff noted that he had formerly worked as a welder, but stopped in 2000, prior to his heart

_____

in hypercholesterolemia." Dorland's Illustrated Medical Dictionary, supra at pp. 1646, 1997.

attack.  Id.  The ALJ returned to his questions regarding the pawn shop, and asked the Plaintiff why he had stopped working there.  Id.  The Plaintiff testified that he had experienced several seizures while at work and, in December of 2003, the owner of the store had hired another employee and let the Plaintiff go.  [T. 416-17].

The ALJ then asked the Plaintiff if he used a CPAP machine, and the Plaintiff stated that he did, and that it helped him "quite a bit" when he slept.  [T. 417].  The ALJ closed his questioning of the Plaintiff by asking him if he had a boat or went fishing, and the Plaintiff testified that, although he used to go fishing, he had not gone in several years.  Id.

The ALJ then asked the Plaintiff's representative if he had any questions, and the Plaintiff's representative asked the Plaintiff how long he had been seeing Dr. Mueller.  Id.  The Plaintiff stated that he had been seeing Dr. Mueller for treatment for depression every week for over one (1) year, and added that he also saw Dr. Saad every six (6) weeks to receive a refill of his medications, although he noted that, when he first started treatment with Dr. Saad, he saw her once every three (3) weeks.  [T. 417-18].  In addition, the Plaintiff testified that he had begun group therapy a month prior to the Hearing, as a treatment for his depression and to alleviate his isolation. Id.

The Plaintiff's representative then asked the Plaintiff to describe a typical day, and the Plaintiff stated that, when he got up, he would see how he was feeling and, if he did not feel well, then he would "take things pretty easy" to insure that he did not have a grand mal seizure. [T. 418-19]. The Plaintiff clarified that, on occasion, he felt a burning sensation in his head, and his vision would be choppy, and that he understood those to be warning signs that he could have a seizure. [T. 419]. The Plaintiff explained that he saw Dr. Lachance, for his seizure disorder, every three (3) or four (4) months, and that Dr. Lachance had recently prescribed Topomax, which had side-effects that caused his hands and feet to fall asleep. Id. The Plaintiff added that he was also taking Dilantin, but continued to have seizures, and had experienced his most recent grand mal seizure one week prior to the Hearing, while he was checking his e-mail. [T. 419-20].

According to the Plaintiff, his last seizure came on suddenly, when his eyes started twitching, his head jerked back, and he fell to the floor. [T. 420]. The Plaintiff's representative asked the Plaintiff if he was conscious during his seizures, and the Plaintiff stated that he was not, but he would eventually wake up and realize that he had experienced a seizure, because he bit his tongue, which would be sore and swollen. Id. The Plaintiff stated that he had a seizure at the pawn shop, and had a

"partial seizure" while he was working in the bar.  Id.  The Plaintiff's representative asked the Plaintiff if he had missed any work, from his current job as a musician, as a result of his seizures, and the Plaintiff stated that he had missed one (1) night of work in the week prior to the Hearing, as a result of the grand mal seizure that he had described.  [T. 421].

The Plaintiff's representative asked the Plaintiff about his sleep habits, and the Plaintiff stated that he generally slept four (4) hours at a time, and would wake up and feel overwhelmed, or would cry, and would be unable to sleep.  Id.  The Plaintiff added that he would take short naps during the day to make up his sleep deficit.  Id. According to the Plaintiff, he would have "fatigue seizures," that would cause him to forget what he was doing for thirty (30) seconds, or one (1) minute, although he noted that most people would not notice that he was experiencing a seizure.  [T. 421-22].

The ALJ resumed his questioning of the Plaintiff, and asked him if he still rode a bicycle.  [T. 422].  The Plaintiff stated that he had stopped riding his bike in the past year, and he did not feel that it was safe, as he feared that he would fall and hurt himself.  Id.  The Plaintiff noted that he continued to drive a car for short distances, such as to the grocery story once a week.  Id.  In response to the ALJ's questioning,

- 20 -

the Plaintiff stated that he did not have any problem shopping for groceries, or lifting or carrying things such as grocery bags. [T. 422-23].

The ALJ asked the Plaintiff if he used an amp when he played guitar, and the Plaintiff stated that he did, but that, since it belonged to the bar, he did not have to lift it. [T. 423]. The Plaintiff testified that he usually walked to his work at the bar, which was approximately two (2) blocks from his house. Id. In response to the ALJ's question, the Plaintiff stated that he did not have any difficulty sitting. Id.

The ALJ then asked the Plaintiff's representative if he had any objection to the qualifications of the Vocational Expert ("VE"), and the Plaintiff's representative stated that he did not. [T. 423-24]. The ALJ then swore the VE to testify. [T. 424]. The VE confirmed that he had reviewed the Record, and that he was familiar with jobs within the State of Minnesota. Id. The ALJ asked the VE if he wanted to make any changes to the Record, and the VE stated that he did not. Id.

The ALJ then posed a hypothetical to the VE, asking him to assume an individual who was between the ages of forty-five (45) and fifty (50), who had the severe impairments of major depressive disorder, adjustment disorder with depression, seizure disorder, history of coronary artery disease status post-stent placement, mild degenerative disc disease of the cervical and lumbar spine, obesity, sleep apnea, and

- 21 -

migraine headaches, who could lift twenty (20) pounds occasionally, and ten (10) pounds frequently, climb stairs and ramps occasionally, with no climbing of ladders, ropes or scaffolds, frequent balancing or kneeling, occasional stooping or crouching and crawling, with no exposure to dangerous moving machinery or operation of motor vehicles, no exposure to unprotected heights, and who could perform unskilled work. [T. 425]. The ALJ asked the VE if the hypothetical individual could perform the Plaintiff's previous relevant work, and the VE replied that the individual could not. Id.

The ALJ then asked the VE if there was any work in the regional or national economy for a person with the Plaintiff's education and limitations, and the VE advised that there were positions, such as mail clerk, which was unskilled work, with an excess of 4,800 positions available in Minnesota; counter clerk, with approximately 8,470 positions available; and bench assembler, with approximately 5,500 positions available. [T. 426]. The ALJ asked the VE whether his assessment would differ, if the hypothetical individual were likely to be absent from work two (2) or more days out of the month, and the VE testified that if that were the case, then the individual would not be employable. Id.

The Plaintiff's representative then asked the VE if he had reviewed the psychological assessment, which was completed by Dr. Mueller and, in particular, Dr. Mueller's opinion that the Plaintiff would have difficulty thinking or concentrating. [T. 426-27]. The Plaintiff's representative explained that he wanted the VE's opinion, as to whether someone with significant difficulty concentrating would have difficulty performing any of the jobs that he had suggested. [T. 427]. The VE replied that, if the individual were so distracted that he could not perform his work function, then he would not be employable, whereas an occasional lapse in concentration would not preclude gainful employment in an unskilled position. [T. 427-28].

The ALJ then clarified that the hypothetical individual should be considered to be unable to concentrate, during the standard period between breaks, and unable to maintain concentration, persistence, or pace, for two (2) hour periods, and the Plaintiff's representative then asked the VE how long a mail clerk would generally have to remain at his workstation, before he would be able to take a break. [T. 428]. The VE replied that two (2) hours was standard, followed by a break of five (5) to fifteen (15) minutes. [T. 428-29].

The Plaintiff's representative then asked the VE to define the position of bench assembler, and the VE explained that the position would require an individual to add

small parts to automobile products, or other work that was typically performed on a

table top setting with a sit/stand option. [T. 429]. The Plaintiff's representative asked

the VE if there were productivity requirements for a bench assembler position, and the

VE replied that all employers would have some productivity standard. [T. 430]. In

response to the next question by the Plaintiff's representative, the VE explained that

a counter clerk would work in a store, such as a video store, and would have brief and

superficial contact with the public, and might be called on to use a cash register, while

a mail clerk would receive, sort, and distribute mail, and the position would involve

some sort of production goals. [T. 430-32].

The ALJ closed the Hearing by confirming that the Plaintiff had an appointment

with a neurologist on March 14, 2006, and confirmed that the Plaintiff's representative

could submit a closing statement following that appointment. [T. 432]. The ALJ then

concluded the Hearing, and thanked the Plaintiff for his testimony. Id.

C.    Evidence Introduced to the Record After the Hearing. Following the

Hearing, the Plaintiff submitted a questionnaire, concerning the Plaintiff's seizures,

that was completed by Dr. Lachance in March of 2006. [T. 399-402]. Dr. Lachance

stated that the Plaintiff could not drive a motor vehicle, work at heights, or operate

power machines that required alertness, but determined that the Plaintiff could tolerate

moderate work-related stress, and would likely be absent from work about one (1) day per month due to his impairment or treatment.  [T. 401-02].  Dr. Lachance further noted that the Plaintiff experienced confusion, exhaustion, and irritability, following a seizure, but that those symptoms only lasted a few minutes.  [T. 400].

On April 3, 2007, the Plaintiff's representative submitted a closing statement, in which he amended the alleged onset date to June 3, 2004.  [T. 157].  In his closing statement, the Plaintiff argued that he met the Listings for epilepsy, as he continued to have one (1) to two (2) grand mal seizures per month, and also for depression, as he suffered multiple symptoms despite treatment.  [T. 158].

D.    The ALJ's Decision.  The ALJ issued his decision on July 14, 2006.  [T. 115-26].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §404.1520.[10]  As a threshold matter,

---

[10]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his original alleged onset date of October 1, 2000.  [T. 17].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  Id.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by recurrent and moderate major depressive disorder, adjustment disorder with depression, seizure disorder, a history of coronary artery disease status post stent placement, mild degenerative disc disease of the cervical and lumbar spine, obesity, sleep apnea, and migraine headaches.  Id.

---

> work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Record as a whole.  [T. 18].  The ALJ noted that Dr. Mueller reported, on February 2, 2006, that the Plaintiff's mental impairments were characterized by anhedonia, decreased energy, thoughts of suicide, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, persistent disturbances of mood or affect, apprehensive expectation, seclusiveness, emotional withdrawal or isolation, motor tension, memory impairment, and sleep disturbance.  Id.

Dr. Mueller diagnosed the Plaintiff with a depressive disorder and an adjustment disorder with depression.  Id.  Thus, the ALJ determined that the "A" Listings criteria had been satisfied, because of the presence of pertinent symptoms.  Id.  The ALJ then conducted an analysis of the "B" criteria, and found that the Plaintiff was mildly restricted in his activities of daily living.  Id.  Specifically, the ALJ noted that Dr. Mueller stated that the Plaintiff had a limited but satisfactory ability to carry out very short and simple instructions, make simple work-related decisions, and be aware of normal hazards and take appropriate precautions.  Id.  The

ALJ observed that, although the Plaintiff testified that, on some days, he was unable to leave his bed, in an activities of daily living questionnaire that the Plaintiff completed on April 12, 2004, the Plaintiff reported that he was able to cook, watch television, take care of his basic needs, drive weekly, and shop monthly. [T. 19]. The Plaintiff also reported that he worked part-time, at a bar, as a musician. Id.

The ALJ further found that the Plaintiff had mild difficulties in maintaining social functioning. Id. Dr. Mueller stated that the Plaintiff was limited, but satisfactory, in his ability to interact with the general public, maintain socially appropriate behavior, and accept instruction and criticism from supervisors, and that the Plaintiff had a very good ability to get along with co-workers. Id. As noted by the ALJ, the Plaintiff testified that he worked as a substitute bartender for a couple of weeks, and worked at a pawn shop for over a year, until that position ended in December of 2003. Id. Moreover, on his activities of daily living questionnaire, the Plaintiff stated that he visited friends and spoke on the phone on a weekly basis, although he also testified that he lived alone, and was fairly isolated. Id.

The ALJ found that the Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace, based in part on Dr. Mueller's opinion that the Plaintiff's ability to perform unskilled work was limited, but satisfactory, in his ability

to understand, remember, and carry out, short and simple instructions.  Id.  Dr. Mueller also reported that the Plaintiff's ability to perform unskilled work was seriously limited, although not precluded, given his ability to remember procedures, maintain regular and punctual attendance, sustain an ordinary routine, and tolerate changes in the workplace.  Id.  As noted by the ALJ, on his activities of daily living questionnaire, the Plaintiff stated that he had difficulty concentrating because of headaches, but the Plaintiff acknowledged that he paid his bills, and handled his own finances.  Id.  In April of 2004, a friend of the Plaintiff had reported that the Plaintiff took care of his own cat, and did not require reminders to take his medications, although she also stated that the Plaintiff seldom completed his chores, and did not adapt well to stress or change.  Id.

The ALJ also concluded that the Plaintiff had not experienced any episodes of decompensation.  Id.  At noted by the ALJ, most of the difficulties, that were reported by the Plaintiff, were brought on by his alleged seizure disorder, and sleep disorder. Id.  The Plaintiff testified that his depression was worse for twenty-four (24) hours after a seizure, that he did not sleep well on occasion, and experienced crying spells when he woke up.  Id.  The ALJ found that the Record did not reflect an exacerbation in the Plaintiff's depressive symptoms, which was accompanied by a loss of adaptive

functioning, or an exacerbation of symptoms, or signs, that would ordinarily require increased treatment.  [T. 20].

The ALJ concluded that the functional limitations, which resulted from the Plaintiff's mental impairments, did not satisfy the requirements of the "B" criteria, or the requirements of the "C" criteria.  Id.  As a consequence, the ALJ found that the Plaintiff did not have either a mental or physical impairment that met the Listings criteria.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the Plaintiff's symptoms, including his subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the objective medical evidence; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; sit 2 hours in an 8-hour workday; stand and/or walk 6 hours in an 8-hour workday; occasional climbing of stairs or ramps; no climbing ladders, ropes, or scaffolds; occasional stooping, crouching, or crawling; frequent kneeling and balancing; avoid all exposure to unprotected heights and dangerous moving machinery or operation of motor vehicles; and is limited to unskilled work.

Id.

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he had been disabled, by his physical impairments, from all work activity since October 1, 2000.  Id.

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that he has daily petit mal seizures, and grand mal seizures two (2) to three (3) times a month, and that he takes Dilantin and Topamax for his seizures.  Id. The ALJ additionally considered the Plaintiff's statement that, on some days, he was unable to get out of bed, and that it took him twenty-four (24) hours to recover from

a seizure, during which time, his depression was worse. Id. The Plaintiff testified that he had one (1) to two (2) beers on a Friday or Saturday night, smoked a half a pack of cigarettes a day, did not take any non-prescription drugs, and took his prescribed medications. Id. According to the Plaintiff, he began experiencing migraines in August of 2005, that were managed by his medication, and he suffered from sleep apnea that was successfully treated with a CPAP device. Id. In addition, the Plaintiff stated that he drove to the store once a week for groceries, and walked to the store in good weather, and that he could not carry anything that was too heavy. Id. On questioning by his representative, the Plaintiff testified that he had been seeing a psychiatrist for over a year for his depression, and also saw a psychologist regularly, and had begun attending group therapy. [T. 21]. The ALJ also noted that the Plaintiff had testified that his last seizure was one (1) week prior to the Hearing date, and that, when he had a grand mal seizure, he became unconscious. Id.

After considering the evidence of Record, the ALJ concluded that the Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, was not entirely credible, and that

the objective medical evidence did not fully support the Plaintiff's allegations regarding his impairments.  Id.

Specifically, the ALJ noted that the Record disclosed that the Plaintiff had a history of coronary artery disease, for which he underwent an angioplasty, and stenting, in October of 2000.  Id.  The Plaintiff was seen on September 28, 2005, for recurrent chest discomfort, and the medical records, from that visit, reported that the Plaintiff's medical history was complicated by "the fact that he has a long history of poor compliance with medications, alcohol abuse, and a somewhat marginal social situation."  Id.  The Plaintiff was given a stress test on October 5, 2005, which was negative for changes of myocardial ischemia, or other symptoms, although the cardiac workload was achieved on that test.  Id.  The Plaintiff's elevated triglycerides were suspected to be the result of alcohol consumption and diet, and he was advised to quit smoking, and to remain compliant with his lipid therapy, and aspirin.  Id.  The ALJ concluded that the Plaintiff's coronary artery disease was severe enough to warrant a light RFC.  Id.

The ALJ also noted that the Plaintiff was diagnosed with medically complex obesity on December 7, 2004, and was recommended to lose weight.  Id.  The Record showed that the Plaintiff had made an effort to be compliant, and the ALJ found that

- 33 -

the Plaintiff's obesity was significant enough to warrant the exertional and postural limitations assessed in the RFC.  Id.

The ALJ also considered the report of Dr. Lachance, which was dated August 29, 2005, in which the Plaintiff's physican noted that the Plaintiff's neurological examination was entirely normal, and that the Plaintiff's history of recurrent seizures was related to medication noncompliance, whereas, when the Plaintiff was compliant with Dilantin, his symptoms were managed.  Id.  Dr. Lachance observed that the Plaintiff was generally compliant, but continued to have occasional partial seizures, with infrequent grand mal seizures, several times a year.  [T. 21-22].

The ALJ noted that Dr. Lachance's report differed significantly from the Plaintiff's testimony at the Hearing, that he had petit mal seizures daily, and grand mal seizures two (2) to three (3) times a month.  [T. 22].  A neurological consultation note from September of 2000 stated that the Plaintiff had admitted that "most of his seizure breakthroughs * * * [are] related to noncompliance," and additionally, observed that the Plaintiff's seizures were associated with a combination of noncompliance and/or alcohol abuse.  Id.  The Record also contained two (2) reports by witnesses, who had observed the Plaintiff experience a seizure, and who reported that the Plaintiff was affected physically, and mentally, for days following the seizure.  Id.  On this Record,

the ALJ found that the Plaintiff's seizure disorder was significant enough to warrant the restrictions, that were included in the Plaintiff's RFC, for climbing ladders, ropes or scaffolds, avoiding all exposure to unprotected heights, or operating dangerous moving machinery, or motor vehicles.  Id.

The ALJ also considered a seizure questionnaire that was completed by Dr. Lachance, in March of 2006, in which he stated that the Plaintiff had one (1) to two (2) localized seizures per month, although he did not have a history of injury associated with seizure, and his post-seizure manifestations, which lasted for several minutes, included confusion, exhaustion, and instability.  Id.  In contrast, at the Hearing, the Plaintiff testified that he experienced symptoms for twenty-four (24) hours following a seizure, including a worsening of his depression.  Id.  Dr. Lachance opined that the Plaintiff would not need to take unscheduled breaks, during an eight (8) hour workday, because of his seizures, that he could tolerate moderate stress, and would miss an average of one (1) day per month due to his seizures.  Id.  The ALJ gave great weight to Dr. Lachance's opinion, and found it to be consistent with the Record as a whole.  Id.

The ALJ noted that, in February of 2006, Dr. Mueller assigned the Plaintiff a GAF of 55, concluded that the Plaintiff was unable to meet the competitive standards

of unskilled work, due to an inability to maintain attention for two (2) hour segments, and to complete a normal workday, and work week, without interruptions from pyschologically-based symptoms, and found that he had no useful ability to function at unskilled work, because of an inability to deal with normal work stress. Id. The ALJ examined the Record, and found that Dr. Mueller's treatment notes categorized the Plaintiff's mental impairments as moderate, which was consistent with the Plaintiff's GAF assessment, but not with Dr. Mueller's opinion that the Plaintiff had marked limitations in three (3) functional categories. Id.

The ALJ noted that, on September 9, 2005, the Plaintiff reported that he had not been taking his Zoloft medication regularly, and was encouraged to do so, and that, on September 15, 2005, the Plaintiff reported improvement in his energy level since taking Zoloft regularly. Id. In October of 2005, Dr. Mueller agreed to meet with the Plaintiff on a weekly basis, because the Plaintiff described isolation and loneliness, but the ALJ observed that, during the same period, the Plaintiff was working at a bar, as a musician, three (3) nights per week. [T. 22-23]. Moreover, in November of 2005, Dr. Muller noted that the Plaintiff reported improved mood. [T. 23]. As a result of his examination of the Record, the ALJ gave little weight to Dr. Mueller's opinion,

as the ALJ found that it was inconsistent with the doctor's clinical notations, or with the Record as a whole.  Id.

In addition to the Plaintiff's treating physicians, the ALJ considered the administrative findings of fact, which were drawn by the State Agency physicians, and gave them little weight, as significant new evidence had been submitted, after those physicians had an opportunity to review the Record.  Id.

The ALJ also considered the Plaintiff's work history, and noted that the Plaintiff reported that he had stopped working because he was laid off.  Id.  The ALJ also noted that the Plaintiff's earnings record was sporadic, with only one (1) year of substantive work, in 1998, of less than $15,000.00, twelve (12) years of no earnings, and the remainder of the years reporting earnings of less than $10,000.00.  Id.  The ALJ concluded that the Plaintiff did not appear to be highly motivated to work.  Id.

In addition, the ALJ found many inconsistencies between the Plaintiff's allegations, and the medical record, which detracted from the Plaintiff's credibility.  Id.  The ALJ noted that, in December of 2004, the Plaintiff underwent a sleep study, and was diagnosed with severe non-position dependent, obstructive sleep apnea.  Id.  The Plaintiff was prescribed a CPAP device and, at the Hearing, testified that the device helped his apnea quite a bit.  Id.  However, in November of 2005, the Plaintiff

reported to Dr. Mueller that his sleep continued to be troubled, which suggested that the Plaintiff's sleep difficulties could be due to poor sleep habits.  Id.

As another example of an inconsistency, the ALJ noted that the Plaintiff claimed that he had daily petit mal seizures, and grand mal seizures, once or twice a month, while a medical record, from September of 2005, reported that the Plaintiff complained of experiencing "occasional seizures."  Id.  In addition, Dr. Lachance reported that, from September to July of 2000, the Plaintiff had been free of seizures and, prior to that period, had been seizure-free for fifteen (15) months.  Id.  Dr. Lachance reported, in March of 2006, that the Plaintiff experienced seizures once or twice a month.  Id.

The ALJ also observed that the Record contained references to the Plaintiff's history of noncompliance with medical treatment.  [T. 24].  A medical record, from July of 2005, reported that the Plaintiff had some difficulty with short-term memory, a short attention span, and poor concentration, and was also vague on details.  Id.  The examining physician noted that the Plaintiff had not seen her for over a year, and had a history of poor compliance with other physicians.  Id.  In September of 2000, Dr. Lachance reported that he had admonished the Plaintiff about the need for compliance with Dilantin, and for the minimization of exposure to alcohol while taking that

medication.  Id.  The Plaintiff testified that he was compliant with his seizure medications, but also stated that he drank alcohol on the weekends.  Id.

In addition, the ALJ found that the Plaintiff was noncompliant with normal seizure precautions, and continued to drive an automobile, despite being warned in September of 2000 by Dr. Lachance, that he should not drive.  Id.  The Plaintiff replied that he felt that, if he were compliant with his seizure medications, then he was able to drive, because he probably would not have a seizure.  Id.  In an activities of daily living questionnaire, that the Plaintiff completed in April of 2004, the Plaintiff stated that he drove weekly and, at the Hearing, the Plaintiff testified that he was compliant with his seizure medications, but continued to have seizures on a daily and monthly basis.  Id.

Based on the Record, the ALJ concluded that the Plaintiff's allegations were only partially credible, and that his physical and mental impairments did not significantly limit him in his ability to meet the basic demands of work activity as demonstrated in his RFC.  Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC that the ALJ had formulated, that the Plaintiff was unable to perform his past relevant work.  Id.  The ALJ explained that the Plaintiff

was a younger individual on the alleged onset date of disability, and that he had a limited education, but was able to communicate in English.  Id.  The ALJ considered the Plaintiff's age, education, work experience, and RFC, and found that the Plaintiff could perform jobs that existed in significant numbers in the national economy.  Id.

The ALJ noted that the VE had testified that an individual, with the Plaintiff's background and limitations, would be able to perform jobs such as mail clerk, counter clerk, and bench assembler.  Id.  Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time, from October 1, 2000, through the date of the decision, which was July 14, 2006.  [T. 26].

## IV.  Discussion

A.     Standard of Review.   The Commissioner's decision must be affirmed if it conforms to the law, and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001).

Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v.

- 42 -

Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual

determinations, therefore, is deferential, and we neither reweigh the evidence, nor

review the factual record de novo.   See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445

(8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92

F.3d 672, 675 (8th Cir. 1996).

      B.    Legal Analysis. In support of his Motion for Summary Judgment, the

Plaintiff advances the following arguments:

>1.    That the ALJ failed to apply the Listings criteria
>properly; and
>
>2.    That the ALJ failed to give the proper weight to the
>opinion of Dr. Mueller, who was the Plaintiff's treating
>psychologist.

See, Plaintiff's Memorandum, Docket No. 10, at 12.

We address each issue in turn.

1.    <u>Whether the ALJ Properly Applied the Listings Criteria</u>.

a.    <u>Standard of Review</u>.   The Commissioner's Listing of Impairments describes those impairments that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  <u>20 C.F.R. §416.925(a)</u>.  Among the Listings relevant here, is Section 11.02, which describes convulsive epilepsy as follows:

> Epilepsy, convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment. With:
>
> A.    Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B.    Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

<u>20 C.F.R. §404, Subpart P, Appendix 1, Section 11.02</u>.

In addition, Section 11.00A specifies that, with epilepsy, "degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures," and "[a]t least one detailed description of a typical seizure is required."  <u>Id.</u> at Section 11.00A.

- 44 -

A finding of Listings-level impairment may only be made "if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment," which can be determined from objective clinical findings, including blood levels of antiepileptic medications. Id. "[E]valuation of the severity of impairment must include consideration of the serum drug levels," and the therapeutic level of drugs in the claimant's bloodstream "should be evaluated in conjunction with all the other evidence to determine the extent of compliance" with the prescribed drug regimen. Id. Finally, "[w]here documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level." Id.

Using these standards as our guide, we proceed to analyze the Plaintiff's arguments.

        b.    <u>Legal Analysis</u>. The Plaintiff's argument at Step Three suffers from a false premise. Repeatedly, the Plaintiff claims that Dr. Lachance had concluded that the Plaintiff suffered from a Listings-level of epilepsy and, as the Plaintiff's treating physician, Dr. Lachance's opinion was conclusive on that issue. See, e.g., <u>Plaintiff's Reply Memorandum, Docket No. 15</u>, at p. 1 ("[T]he ALJ

inappropriately discredited the treating physician's (Dr. Daniel Lachance) medical opinion that claimant's epilepsy meets the requirements of Listing of Impairment 11.02."); at p. 3 ("On 3/28/06 Dr. Lachance provided his medical opinion that Mr. Breeze met/equaled the Listings at 11.02 for epilepsy because Mr. Breeze continues to have 1-2 loss of consciousness seizures per month plus Mr. Breeze is compliant with taking his new medication - Topomax * * *."); at p. 3 ("Granting great weight means 'controlling weight' would require an allowance of benefits because Dr. Lachance's medical opinion meets/equals Listing 11.02 for epilepsy.").  Apparently of the view that repetition imbues an otherwise incorrect statement with veracity, the Plaintiff mistakenly argues that Dr. Lachance articulated opinions, relevant to the Step Three of the analysis, which he plainly did not.

Notably, at the beginning of the Hearing before the ALJ, the Plaintiff advised that he had an appointment scheduled before Dr. Lachance on March 14, 2006. Following that appointment, but before the ALJ issued his opinion, the results of that examination, as contained in a "Seizures Residual Functional Capacity Questionnaire," were shared with the ALJ.  [T. 399-402].  In that Questionnaire, which is dated March 28, 2006, Dr. Lachance advised that the Plaintiff had seizures that were "localization related," that involved a "loss of consciousness," and had an

average frequency of one to two per month, with the last occurring on January 6, 2006." [T. 399].

However, Dr. Lachance did not so much as intimate that the Plaintiff suffered from epilepsy of Listings-level severity -- even though Dr. Lachance practices the specialty of neurology, and was plainly completing a Social Security Form. Since the Plaintiff bore the burden of demonstrating, at the Third Step, the severity of his epilepsy, it would have been a simple matter for the Plaintiff to have secured an opinion of Dr. Lachance, if the neurologist had an opinion that the Plaintiff's epilepsy satisfied the requirements of the Listings, or surpassed them. See, Brown v. Shalala, 15 F.3d 97, 98-99 (8th Cir. 1994), citing Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987).

Rather, Dr. Lachance opined, during the course of his assessment of the Plaintiff's epilepsy, that the Plaintiff would not "need more supervision at work than an unimpaired worker," that he can "take a bus alone," that he will not "need to take unscheduled breaks during an 8-hour working day," that, in the workplace, "moderate stress is okay" for the Plaintiff, and that he will have "'good days' and 'bad days,'" but "that he is likely to be absent from work as a result of the impairments or treatment," "[a]bout one day per month." [T. 401-402]. These are not clinical

assessments which denote a severely impaired person, but rather, reflect an individual who ought to have specific limitations as to working at heights, with power tools, and in operating a motor vehicle -- notably, those were restrictions that the ALJ included in his RFC.  [T. 401] and [T. 22].

We understand the Plaintiff to suggest that the simple fact that Dr. Lachance observed that the Plaintiff was experiencing seizures one to two times per month, is sufficient to satisfy the pertinent Listings criteria, but he offers no legal or medical authority to that effect.  Plainly, if the frequency of seizures was the sole parameter of Listings-level epilepsy, then the remainder of the requisites of that Listing must simply be ignored -- a prospect we find unacceptable.  Nor does the evidence demonstrate that the severity of the Plaintiff's seizures, or the length of their aftermath, engenders a permanently and totally incapacitating condition.

Indeed, Dr. Lachance's clinical assessment was different from the Plaintiff's testimony, at the Hearing, that he experienced "petite seizures somewhat daily and my grand mals are about two or three a month, maybe." [T. 412-413].  Similarly, while the Plaintiff testified that he experienced symptoms during the twenty-four (24) hours following a seizure, [T. 414], Dr. Lachance concluded that, after a seizure, the symptoms -- which are medically referred to as "postictal manifestations" -- lasted for

only "minutes." [T. 400]. Dr. Lachance had also cautioned the Plaintiff about driving a motor vehicle but, at the Hearing, the Plaintiff testified that he continues to do so, which is wholly inconsistent with a person who suffers from unexpected, randomly occurring, seizures which could result in loss of consciousness. As recounted by the ALJ, the Plaintiff explained to Dr. Lachance that, "if he is compliant with his seizure medications he could legitimately drive because he probably would not have a seizure." [T. 24]. Further, Dr. Lachance concluded that the Plaintiff had never been injured as a result of a seizure. [T. 400].

Given this Record, we find no evidence that the ALJ committed error in failing to find that the Plaintiff suffered from Listings-level epilepsy, as the Record is without any informed basis upon which to make such a finding. Moreover, to the extent that the Plaintiff subtly blends a failure to fully and fairly develop the Record argument, into his criticism of the ALJ at Step Three, we find nothing to suggest that a further development of the Record was required. The ALJ gave "great weight to Dr. Lachance's opinion finding it to be consistent with the record as a whole and consistent with the residual functional capacity assessment," [T. 22], and that opinion was essentially contemporaneous with the ALJ's decision. If, as the Plaintiff testified, he was incapacitated for twenty-four (24) hours by the seizure itself, and then for an

additional twenty-four (24) hours by the postictal manifestations, [T. 414], then he would have surely been expected to miss significantly more than "[a]bout one day per month," [T. 402], which was Dr. Lachance's appraisal, based upon his clinical relationship with the Plaintiff.  Indeed, we find it telling that the Plaintiff advanced no argument, that he had epilepsy at a Listings-degree of severity, until he sought review at the Appeals Council and, even then, he did not proffer the opinion of Dr. Lachance, or any other treating medical source, to support his contention.[11]

Accordingly, we find no error at Step Three which requires a reversal and remand.

---

[11]The Social Security Regulations recognize a number of circumstances which require a consultative examination, such as additional evidence being needed that is not contained in the records of the claimant's medical sources; evidence is not available from the claimant's treating sources for reasons beyond the claimant's control; highly technical or specialized evidence is not available from the claimant's treating or other medical sources; a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved; or there is an indication of a change in the claimant's condition that is likely to affect his or her ability to work.  See, 20 C.F.R. §404.1519a(b).  The Plaintiff has not presented any such circumstances, and [t]he regulations * * * do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment," as they "simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient to make a determination." Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989).  Accordingly, we find no failure of the ALJ to fairly and fully develop the Record.

2.     Whether the ALJ Failed to Give the Proper Weight
       to the Opinion of the Plaintiff's Treating
       Psychologist.

In addition to his argument at Step Three, the Plaintiff contends

that the ALJ erred by failing to accord the findings of Dr. Mueller, who is the

Plaintiff's treating psychologist, controlling weight, and instead substituted his own

medical findings.  See, Plaintiff's Memorandum in Support, supra at p. 15.

a.     Standard of Review.  When a case involves medical opinion

-- which is defined as "statements from physicians and psychologists or other

acceptable medical sources" -- the opinion of a treating physician must be afforded

substantial weight.    20 C.F.R. §§404.1527 and 416.927; see also, Forehand v.

Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th

Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater,

76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's

treating physician is not necessarily conclusive.  See, Forehand v. Barnhart, supra at

986 ("A treating physician's opinion is generally entitled to substantial weight,

although it is not conclusive and must be supported by medically acceptable clinical

and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

- 51 -

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. Id. As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5). When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii). Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ. See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

b.      Legal Analysis.  The Plaintiff argues that the ALJ failed to accord proper weight to the opinion of Plaintiff's treating psychologist, Dr. Mueller, who opined that the Plaintiff's depression rendered him unable to function at work.

As previously noted, the ALJ need not give any weight to a treating physician's conclusory statements regarding total disability.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1); see also, Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) ("Dr. Hines was of the opinion that Vandenboom would not be able to return to work, but a treating physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight.'"), quoting Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  Moreover, if justified by substantial evidence in the Record as a whole, the ALJ can discount the treating physician's opinion.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.

With respect to the Plaintiff's mental impairments, the ALJ determined that Dr. Mueller's opinion, as to the Plaintiff's functional limitations, was inconsistent with Dr. Mueller's then current GAF assessment of the Plaintiff, which was 55, and which represented only moderate limitations.  [T. 22].  The ALJ explained that, in September

of 2005, the Plaintiff reported that he was not taking his antidepressant medications regularly and, in a follow-up visit later that month, he remarked that his energy level had improved when he resumed his prescribed treatment.  Id.

Although, in October of 2005, Dr. Mueller agreed to begin meeting with the Plaintiff on a weekly basis, in order to address his complaints of loneliness and isolation, the ALJ recognized that the Plaintiff worked three (3) nights a week, as a part-time musician in a bar, which reflected an ability, on the Plaintiff's part, to maintain social contacts through his activities.  [T. 22-23].  In addition, when the Plaintiff visited Dr. Mueller in November of 2005, he reported that his mood had improved.  [T. 23].  Based upon those inconsistencies, between Dr. Mueller's claimed limitations for the Plaintiff, as augmented by the evidence in the Record as a whole, the ALJ gave little weight to Dr. Mueller's opinion.

Our Court of Appeals has upheld an ALJ's decision "to discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Reed v. Barnhart, 399 F.3d 917, 920-21 (8th Cir. 2005), quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).  Social Security Ruling 96-2p further provides that "a

treating source's medical opinion on what an individual can still do despite his or her impairment(s) will not be entitled to controlling weight if substantial, nonmedical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion."

Here, the ALJ made an express finding that "Dr. Mueller's treatment[] notes categorize the claimant's mental impairments as moderate as does his current GAF assessment, which is not consistent with his opinion that the claimant has marked limitations in the three functional categories." [T. 22]. At no point does the Plaintiff parse the Record, and demonstrate that the ALJ's independent appraisal of Dr. Mueller's clinical notations was inaccurate, nor does he discount the inconsistency between being totally disabled as a result of a mental impairment, and yet functioning as a musician, in a bar setting, three (3) nights a week. Based on his activities of daily living, the Plaintiff maintains a relatively normal routine; taking care of himself, shopping for his necessities, and engaging in entertaining activities which simultaneously generate some income.

We do not suggest that, necessarily, we would draw the same findings as did the ALJ, but that is not the standard which governs our review. The ALJ's decision amply demonstrates that, in accordance with the applicable law, he canvassed the

Record, and resolved "the various conflicts and inconsistencies in the record," and "[that] is precisely what an ALJ is instructed to do." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003), citing Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting Bentley v. Shalala, supra at 785-86; Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001)(same). Accordingly, we find no error in the ALJ's assessment of the weight to be given to Dr. Mueller's psychological opinions.

Therefore, finding no reversible error in the ALJ's analysis or decision, we recommend that the Defendant's Motion for Summary Judgment be granted.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion [Docket No. 12] for Summary Judgment be granted.

2.     That the Plaintiff's Motion [Docket No. 9] for Summary Judgment be

denied.


Dated:  August 11, 2008                    *s/Raymond L. Erickson*
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.2(b), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties by no later than **August**

**28, 2008**, a writing which specifically identifies those portions of the Report to which

objections are made and the bases of those objections.  Failure to comply with this

procedure shall operate as a forfeiture of the objecting party's right to seek review in

the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **August 28, 2008**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.